PARISH AND PARISH MINING COMPANY, a partnership consisting of Cecil Parish and Winfred Parish, Appellee and Appellant, v. SERODINO, INCORPORATED, an Ohio Corporation, V. P. Serodino, its process agent, Arrow Transportation Company, Inc., Appellees, TENNESSEE VALLEY AUTHORITY, Appellant, and FIRST NATIONAL BANK, Nashville, Tennessee.—372 S. W. (2d) 433.

Western Section at Jackson. January 31, 1963.

Certiorari Denied by Supreme Court October 11, 1963.

198

Charles J. McCarthy, Thomas A. Pedersen and Beauchamp E. Brogan, Knoxville, for T. V. A.

J. Lee Taylor, Huntingdon, for Parish & Parish Mining Co., appellant and appellee.

Raulston, Raulston & Swafford, Jasper, for Serodino, Inc.

AVERY, (P.J., W.S.). This suit comes to this Court from the Chancery Court of Carroll County, Honorable Wayne A. Cox, Chancellor. The basis of the suit is an original contract entered into by and between Perry

County Phosphate Company, executed on the 13th day of July, 1953, for the sale of certain type white phosphate rock by said Perry County Phosphate Company to Tennessee Valley Authority, which contract was later assigned to the complainants in this cause on the 24th day of October 1955, to which assignment the Tennessee Valley Authority consented without releasing the Perry County Phosphate Company from any of its obligations under said contract.

For convenience the original plaintiffs will be referred to as "Parish"; the Tennessee Valley Authority will be referred to as "TVA."; Serodino, Inc., will be referred to as "Serodino" and the Arrow Transportation Company, Inc., will be referred to as "Arrow".

First National Bank of Nashville, Tennessee, also one of the defendants is interested merely as an assignee of Parish.

The suit actually involves certain white rock phosphate alleged to have been delivered by Parish to the Tennessee Valley Authority at its Wilson Terminal at Wilson Dam, Alabama, the delivery of which was provided for by the terms of said contract, and which delivery TVA denies was ever made under the terms of the contract.

After the original bill sets out the basis for Parish's complaint against the respective defendants in item II of the prayer, it is prayed:

"That upon a hearing of this cause the Complainants be granted a judgment at the hands of this Honorable Court for the sum of $6,752.41 against the Tennessee Valley Authority; but if mistaken in this, that they be granted a judgment in the sum of

$6,055.35 against Serodino, Incorporated and Arrow Transportation Company.''

The original bill was filed on the 14th day of January, 1958.

What is referred to as a final decree was entered on the 10th day of March 1962, but that decree was amended on the 19th day of May 1962. The final decree provides for the recovery by Parish of TVA the sum of $6,752.41 with interest at 6% from and after the 14th day of January 1958, the date the bill was filed. By the decree the cause was dismissed as to Serodino.

The TVA saved exceptions to the Chancellor's decree awarding a judgment against it and Parish saved exceptions to the Chancellor's decree dismissing the suit as to Serodino. Both TVA and Serodino prayed an appeal to this Court, which was granted, the appeal perfected, and the case was heard on September 27, 1962, taken under advisement and is now disposed of by this opinion.

Parish had contracted with Serodino to deliver the phosphate to TVA. Thus Serodino became the agent of Parish. Serodino in turn engaged Arrow to deliver the barges of phosphate to Wilson Terminal. Thus Arrow became the admitted agent of Serodino and Serodino accepted full responsibility for Arrow's acts.

The two barge loads, Nos. D-92 and D-96 of phosphate here involved in this lawsuit, were shipped by barge on May 25, 1956, owned by Serodino, and which barges were towed by Arrow as the agent of Serodino, arriving at Wilson Terminal May 27, 1956. These two barge loads of phosphate were shipped from Tom's Creek, Perry County Tennessee, to Wilson Terminal, Wilson Dam,

Alabama. These two barges arrived by tow of Arrow at said Wilson Harbor at 5:15 on Sunday morning, a nonworking day of TVA at the Harbor. By 2:00 P.M. on that date both barges had sunk there in the harbor.

In short the assignments of TVA are as follows:

## "I

"The Chancellor erred in decreeing that the barges, upon their arrival at Wilson Harbor, were dry and in good condition.

## "II

"The Chancellor erred in decreeing that there was a safe delivery of the cargo of phosphate.

## "III

"The Chancellor erred in decreeing that the phosphate became the property of TVA when delivered to Wilson Harbor and that title to the phosphate was in TVA at the time the barges sank.

## "IV

"The Chancellor erred in decreeing that the BPL content of the phosphate was above 67 percent.

## "V

"The Chancellor erred in decreeing that the sum of $1,665.10 paid by TVA to Parish for the salvaged phosphate was in mitigation of damages.

## "VI

"The Chancellor erred in decreeing that TVA was liable for Parish's loss."

These assignments taken together raise only three questions to be determined by this Court, and these questions are properly stated as follows:

1—WAS THERE A LEGAL DELIVERY OF THE PHOSPHATE LOADED IN THESE TWO BARGES TO TVA AT ITS WILSON HARBOR?

2—IF THERE WAS A LEGAL DELIVERY OF THE PHOSPHATE TO TVA HAD TITLE TO THE PHOSPHATE LOADED THEREIN PASSED TO TVA WHEN IT SANK?

3—WAS THE PAYMENT BY TVA TO PARISH OF $1,665.10 FOR THE SALVAGE PHOSPHATE PAYMENT UNDER A SEPARATE AND DISTINCT CONTRACT BETWEEN PARISH AND TVA?

It is insisted by TVA that there was no legal delivery of the involved phosphate to it because of the violation of the contractual provisions which provided that the title to this phosphate was to remain in Parish "until delivery in acceptable condition by the carrier", and because one of the barges was leaking at the time of delivery, the obligation of the carrier had not been fulfilled because to constitute delivery there must be a safe and proper delivery; that when the barges arrived at Wilson Dam with one of them leaking it was the duty of its tow to care for such cargo and not delegate that authority to others; that this obligation can not be met by notifying an employee of TVA who had nothing to do with nor authority for receiving barges and their cargo.

It is further insisted by TVA that even if the barges when tied up in Wilson Harbor, constituted legal delivery

to it, title to the phosphate had not passed to it because that under its contract it had the right of inspection and to reject the shipment, within a reasonable time, and until this was done, title to the phosphate did not pass to TVA. Thus it is insisted that the phosphate had to be weighed, tested and analyzed by TVA to determine whether it was acceptable under the contract and then if acceptable, what the amount of the payment was to be, and upon such a notice Parish would then submit invoices for payment. Thus TVA insists that none of these things were done, that there was no time for doing them and accordingly title to the phosphate did not pass to it because TVA was not required to accept the phosphate if it contained less than 63% BPL. All such defenses were embraced in the answer of TVA to the original bill.

Upon this point it is insisted by Serodino that when the barges were towed in to Wilson Harbor and there tied after being loosed from the tow, that there was a constructive delivery of the cargo; that title passed to the buyer subject to the right of inspection and if the goods were lost or destroyed before this right was exercised, the loss must fall on the buyer. It is insisted that the Chancellor so found all of the issues in favor of Serodino or his superior, Parish & Parish Mining Company and, therefore, the Chancellor's decree is correct.

All of the defenses raising the issues now discussed in this Court, are raised by the respective answers of defendants, and in the brief of counsel for Serodino, responding to the assignments of error and brief of TVA, learned counsel has said:

"Parish was in the enviable position of having lia-bility admitted and the defendants fighting among themselves—seeking to shift the responsibility to the other defendant. Which defendant would be liable would depend upon whether the title was in the complainant, Parish, at the time that the phos-phate was destroyed or whether title was in the defendant, TVA. If the title were in the complain-ant, Serodino would be responsible. If title were in TVA, then, Parish should recover against TVA.

\* \* \* \* \* \*

"It frequently happens that after the contract of sale is entered into, the property is accidentally lost or destroyed and the question arises in such cases as to which party must bear the loss. The ultimate determination of the question depends on whether the title has passed, for the risk of loss follows the title.

\* \* \* \* \* \*

"In this case the original complainant, Parish, is entitled to recover against either Serodino or TVA, and *which defendant would be responsible would depend upon whether the title was in Parish at the time the phosphate was destroyed or whether title had passed to the defendant, TVA. If the title were in the complainant, Parish, then Serodino would be responsible for having failed to deliver the phos-phate. If title were in TVA; then, the recovery should be against TVA."* (Emphasis added.)

If counsel for Serdino are correct in this statement hereinabove quoted, then there could be only one real question in this case and that would be:

## HAD TITLE PASSED INTO TVA AT THE TIME THAT THE PHOSPHATE SANK?

The question of whether title had passed must depend upon a proper construction of the terms of the contract which forms a basis of this cause, applied to the facts as revealed by the record. We, therefore, look first to the provisions of the contract involved. This procurement of the involved phosphate, with much more, was first undertaken by submitting invitations to bid on it, setting out the specifications etc. The invitation to bid is made a part of this contract, however, the contract shows that after being submitted there were no bidders whose bids were successful and the contract was negotiated following unsatisfactory advertising for bidders. The exact statement is :

"Purchase was made by negotiation following unsatisfactory advertising to 5 bidders and posting in public places."

It then shows that the vendor of the phosphate is "Perry County Phosphate Company" and that the contract was awarded to cover approximately $400,000.00 worth of this material. One part of this contract is headed "General Conditions". It then describes the method of shipment and use of government bill of lading and provides for, (2) Changes in Freight Rates, (3) For Prepayment of Transportation Charges. In item 4, sub-heading "Risk of Loss or Damage in Transit:

"If the contract is awarded upon the basis of a price * * * title to the goods and risk of loss or damage shall remain in the Contractor until delivery in acceptable condition by the carrier at destination * * *"

There are many provisions in this contract because they are embraced within the "Invitation to Bid" submitted, which are a part of this negotiated contract originally with the predecessors of Parish, and specifically assigned to them as hereinbefore stated. So that for an explanation of the contract, assuming that the contract speaks for itself, which we have carefully read, and which we think can be better understood by the analysis of a witness for TVA, James E. Casey of Division of Chemical Engineering. This witness was asked and answered:

"Q—Now, under the contract, when do the complainants send in their invoices for the amount of material? Is it prior to the time it is shipped, or after it is weighed and tested?

"A—The contract stipulates that the invoicing has to be based on TVA weights, and the only way that TVA can weigh it is in railroad cars.

"Q—Will you state from the contract what the minimum requirement of the contract for the shipment of the material, such as accepting it, whether or not it is in acceptable condition on the part of TVA; in other words, what does the material have to measure up to to be in acceptable condition?

"MR. SWAFFORD: We object to that because the contract speaks for itself. It has already been introduced here."

That is very true that the exception was made but there was no ruling on it shown in this record and for the benefit of this record and in this opinion it may be said that likely 100 objections to different questions

that are asked different witnesses in this record, but there is no showing that any of them were ever sustained or acted upon in anywise by the Chancellor, nor by the person for whom the depositions were being taken. Therefore, we are not going to presume the Chancellor did or did not give consideration to these statements in response to questions which had been objected to, for many and various reasons set out in the deposition. There was never an exact answer to the above question, and then the question was supplemented after Mr. Swafford's objection:

"Q—All right. Under the terms of the contract— I believe it states here the limiting range for the BPL content is 63 per cent; is that correct?

"A—63 to 71.

"Q—And it is supposed to average 67?

"A—Yes, sir.

"Q—If it falls below 63, could the TVA reject it, if it doesn't measure up to the TVA minimum?

"A—In this case, and all cases, TVA seeks to avoid working a hardship on a contractor. We have accepted deliveries that were slightly under, for example 61 or 62 per cent, but in doing so, there was a specific exception made, it was not a waiver of our prerogatives.

"Q—So each future delivery, if it fell below the 63 per cent guarantee minimum, you could reject it?

"A—Yes, sir."

This witness was carefully cross examined by counsel for Serodino and for Parish, with respect to this con-

tract, and on these cross examinations without objection, he testified that the phosphate was to be F. O. B. barge at Wilson Dam, Wilson Terminal, Wilson Dam, Alabama. He was then asked:

"Q—Now, where is Wilson Terminal?

"A—That is the harbor a short distance above Wilson Dam on the Colbert County side of the river, in other words, on this side of the river.

\* \* \* \* \* \*

"Q—And that was the place where the barges overturned or sank?

"A—I am not aware whether they were tied to the terminal wall or whether they were tied out in the harbor, in other words, away from the wall.

\* \* \* \* \* \*

"Q—But the TVA purchased the rock free on board, you call it, at Wilson—at Wilson Terminal, that was the provision of the contract, was it not?

"A—Yes."

Now returning to the testimony offered by Parish. This is contained only in the deposition of the two Parish brothers, Cecil and Winfred. According to their proof there is no question whatever that Serodino contracted with this Parish and Parish, a partnership, to deliver this phosphate from Tom Creek harbor in Perry County to the consignees at Wilson Terminal. As to the involved shipments, their proof shows that these two barges were placed in their terminal about two weeks before they left the terminal. The loading processes were begun and according to some weight made

by Parish that barge 92 contained 1,041,130 pounds, all of which came from what is said to be the property of Sam Barber. Barge 96 contained 939,460 pounds and of this amount 329,300 pounds came from what is said to be the Greenway property and remainder in that barge came from the Barber property. As these barges were being filled there was at least one sample taken to a chemical analysis company over at Columbia, or a point near there, and the analysis that Parish had made by these analysts showed the BPL content of the rock to measure up to the standard which was required to be that acceptable to TVA and above even the 67%

TVA never made an analysis of this phosphate because these barges sank and so it is undertaken by Parish to prove the analysis by their own chemical experts report.

These barges left Tom's Creek, the last having been completely loaded on the day it did leave,—the other one having been loaded for some four days or longer, sitting in Tom's Creek harbor,—being towed by Arrow, and it should be said there is no dispute whatever between the parties with respect to who had the contract to deliver and that Serodino having that contract, had a contract with Arrow to do the towing of the vessel and a short while, approximately 2 o'clock on Sunday morning after these barges left Tom's Creek terminal on the day before, one Mr. J. O. Burelson of the Division of Reservoir Properties, who at that time was apparently answering the telephone at Wilson Terminal, had a message that came by telephone in which it was told there were two barges loaded with phosphate in route to Wilson Terminal and that they would arrive about 4 o'clock

A.M. and the further information that one of the barges was leaking. Mr. Burelson and one James B. Sharp, also of same Division, appear to be the only two persons on duty there at that hour on Sunday, but who were not authorized to receive shipments of any kind for TVA, and Mr. Sharp was told of the message received by Mr. Burelson and requested to be on the lookout at the harbor at about the time it was said these barges would arrive. Mr. Sharp did go to the harbor and he said he was there some little while and as these barges came up in the harbor he saw a deckhand taking a pump off of one of the barges and carrying it into the tow. He further stated that the crew tied the two barges up, the tow immediately left. He was not requested by the deckhand or anybody else on the tow to receive the barges; he did not receive them and made no effort to receive them for he had no authority to do so, but he said that he did look into the barge the best he could with a flashlight and he could not see any water in the hull. He went back to the Terminal and to these barges on two other occasions, that first occasion being about 5:15, the second occasion about 30 minutes later and the third about 30 minutes after the second, and that each time he looked through the porthole in the barges with a flashlight, as best he could tell they were dry. However, he said that it was impossible for him to see both ends of the barge; that he looked through the opening in the middle of the barge and he was unable to detect any dangerous condition existing in the barge.

This man was employed in the public safety service of TVA on outside motor patrol that night and he made a report, which is designated "Officer's Report", and it contains the name "Sharp" and has this: "Dock Report,

Wilson Dam, 7:00 A.M. 5-27-56, Sharp, No. 5, Shift 'C', River Channel Equip. The Betty brought in two barges of phos-ore at 5-15 A.M. one barge is leaking in the hull." It is shown that the name of the tow was Betty or Betty Sue that was operated by Arrow and had carried these barges into that particular described terminal area.

This witness stated that he was on "motor patrol outside" and in explanation of what his duties were as such motor patrolman he said:

"We check buildings, and patrol all the side roads and check traffic."

He was asked and answered:

"Q—Will you state what happened, if anything, when the barges entered the harbor?

"A—Well, I saw the boat coming around the little point, and I went off down the dock and waited there until the boat came in. They were taking a pump off of it, and the deckhand said one was leaking, and I said which one, and he said the one that was to be tied next to the dock. They got the pump off, and the boat left."

He further said that he was not requested to do anything about it, not even to look at it but as stated above, he did observe what he described.

He further stated the deckhand did not ask him to notify anybody, did not ask him to call anybody and the boat captain said nothing to him and that no one with the tow authorized him to do anything or say anything with respect to the leaking barge and he was given no message for any person, official or otherwise, by any

one with the tow boat or barge. He was then asked and answered:

"Q—Were you given any authority, by anyone with the barge, to do anything to the leaking barge?

"A—No, sir; I wasn't."

It is obvious from this record that no official, employee or other person connected with TVA at Wilson Dam or elsewhere knew anything about these barges coming in to the Reservoir except the witnesses, James O. Burelson and James E. Sharp, until 7:30 on Monday morning following the sinking of the barge sometime Sunday afternoon. And as stated, so far as this record shows the two named gentlemen were the only ones within the area to answer telephone or otherwise attend to the matters in which the TVA was involved at the Wilson Dam Reservoir.

Since no person with Serodino, nor its agent Arrow Transportation Company, testified in this cause, Serodino obviously hopes to make out the case for Parish against TVA by an interpretation of the contract together with the testimony of witnesses for TVA. That is obvious because Parish knows nothing about the barges, and so testify, after they left Tom's Creek terminal, which was their dock, and from which the phosphate was carried by tow of Arrow.

Unquestionably among the elements to be considered in connection with what has heretofore been said respecting the barge being docked, admittedly leaking in transit, though the water had been pumped out at the time it was docked in the reservoir at Wilson Dam, is whether there

has been a delivery under the provisions of the contract hereinbefore quoted to the effect that:

"* * * title to the goods and risk of loss or damage shall remain in the Contractor until delivery in acceptable condition by the carrier at destination * * *".

Thus we ask ourselves the question, is a leaking barge, the leak in which is admittedly not repaired, loaded as hereinabove referred to, in an acceptable delivery condition?

Another element for consideration is the question of whether title passes until the determination of the weight and quality of the product involved has been determined by the consignee or purchaser, where he is to weigh the product and to determine the content of an element therein specified in the contract, upon which weight and determination of element he is to advise the seller to submit a bill for same as provided in the contract.

It is admitted, and whether admitted or not, the proof clearly shows that the phosphate was to be paid for after it had been delivered, had been weighed, the BPL content determined, and notice furnished by TVA to Parish, upon which information TVA was then to be billed for payment by having furnished to it an invoice by Parish conforming with TVA's determination of weight and BPL content of the phosphate, after it had accepted a physical delivery in its reservoir at Wilson Dam. So it appears that TVA reserved both the right of inspection, determination of BPL content and the right of rejection of the phosphate involved under the contract relied upon. Thus the question:

Must TVA accept delivery, so as to pass title, when the barge load of phosphate is tied up in its Wilson Dam

reservoir in leaking barges before inspection, and thereafter rescind or reject title and turn it back to the consignor Parish from whom it had been purchased or contracted for?

Both parties have relied upon the Tennessee case of Dean v. Vaccaro & Company, 39 Tenn. 488 (1859).

An examination of Shepard's Citations reveals the fact that this case has not been referred to since the opinion was published in 1859 in any other Tennessee decision. It does appear that the decision in that case remains the law in the State of Tennessee, and while both parties have relied upon that case, it seems to us that the real holding in that case would support the contention of the defendant TVA that there had been no valid delivery upon the third element to be considered, that some motor patrolman on duty at night had come down to the wharf and had seen the barges tied up. The case of Dean v. Vaccaro Company involves a shipment of cigars by river transportation with destination, Memphis, Tennessee. Consignee was Vaccaro. In that opinion, speaking of the cigars, the Court said:

"They were landed on the wharf at Memphis, and delivered over to one of the city draymen, by the clerk of the boat, to be carried to the consignee, Vaccaro, but never delivered to him. On the arrival of the boat, the bill of lading was handed to Vaccaro, but no other notice given to him on the subject, and it does not appear by the case agreed, that he, in fact, had any notice of the arrival of the boat, further than it might be implied from the receipt of the bill of lading. The boat landed at the port on Sunday, and on the next day she was unloaded, and the cargo

turned out upon the wharf at the usual place of landing, and the goods in question placed in charge of a drayman, as before stated. There is no evidence that Vaccaro was cognizant of any of these facts, or that any authority was given by him for that mode of delivery, except it may be implied from the usage of the port * * *.

"What shall be a sufficient delivery to discharge a common carrier, by water, has given the courts some difficulty in all commercial countries."

One of the possible distinguishing differences, which makes but little difference in the legal aspect of the two cases, which is commented upon by the Court in that case, is stated as follows:

"There is no sufficient evidence that the consignees had any knowledge of the arrival of the boat, and the landing of the goods. The delivery of the bill of lading by the agent afforded no evidence that the boat had arrived, or the time when it would arrive. It would not amount to notice of the time, or raise any reasonable presumption of it."

Unless the telephone conversation to this man Burelson, which conversation is not very well identified from what source it originated, that the involved phosphate was on the way in two barges, one of which was leaking and would land or be delivered in the reservoir sometime around 4:00 o'clock, and the fact that this man Sharp was notified of that purported arrival, and saw these barges delivered, makes a difference in the two cases favorable to the complainant Parish, there is no application whatever in the case of Dean v. Vaccaro Company to the facts

of the instant case and the application of the law thereto, for in Dean v. Vaccaro Company the Court, after making the statement above quoted without disconnection, said:

"To excuse the carrier, and relieve him of his legal responsibility, notice must be given, or knowledge otherwise fixed upon the consignee, not only that the goods have been shipped, or are on the way, but that they are at the wharf, so that they may be taken charge of at once, and secured from hazard by the person interested. This important fact is not made out in the case before us, and, therefore, the defendants were properly held liable. The usage or custom of that port cannot be allowed to excuse notice; it is (not) enough to give it the effect of dispensing with actual delivery to the consignee. Nor can the custom of delivering goods to public draymen, have the effect of superseding the requirements of the law on this subject. That this consignee, and many others, had submitted to it before, when no loss occurred, would not bind them to yield their legal right to notice, when it became their interest to assert it. Such a custom cannot change the law in that respect."

It is insisted that the parties who had notice of the delivery of these barges were not such officials of TVA that could accept the material under any circumstances, to say nothing of the fact that they had no authority to accept it in a leaking barge. It is said by TVA in its brief:

"Before TVA can be held to have accepted the material under these circumstances, affirmative action by an authorized and responsible TVA official, with

full knowledge of the facts, would have been necessary. As was said by the Court in F. E. Grauwiller Transp. Co. v. Gallagher Bros. S. & G. Corp., 173 F. (2d) 708 (2d Cir. 1949):

"This was not such a delivery; not only was it out of hours, but it was to the last degree perilous, as the event proved. If the tug would discharge itself of its duty, it was bound in such circumstances to secure an express acceptance, and there could be no acceptance except by an employee authorized by the Henry Company to accept. The maundering of the Sherlie's bargee was utterly inadequate for the purpose. If a tug master chooses to leave his charge wantonly exposed to destruction, he will not relieve his principal by sending an inarticulate bargee to announce what he has done to whomever he may find about the premises."

Both parties also insist upon the meaning of the Uniform Sales Act in Tennessee and in Alabama to support their respective contentions relative to delivery and passing or not passing title. However, plaintiff and Serodino relied upon the rules and regulations set forth in T.C.A. Sec. 47-1219, and particularly Rule 5 under that section which is as follows:

"If the contract to sell requires the seller to deliver the goods to the buyer, or at a particular place, or to pay the freight or cost of transportation to the buyer, or to a particular place, the property does not pass until the goods have been delivered to the buyer or reached the place agreed upon."

With that provision plaintiff says that the barges loaded with the phosphate had reached the place agreed

upon, which was Wilson reservoir and had been tied up in the harbor, and that the proper official of TVA had had notice. On the other hand, it is insisted that Rule 5 has no application, except as related to the facts of the case, and that section 47-1248 T.C.A. is the controlling provision of the Act, which provides as follows:

"The buyer is deemed to have accepted the goods when he intimates to the seller that he has accepted them, or when the goods have been delivered to him, and he does any act in relation to them which is inconsistent with the ownership of the seller, or when, after the lapse of a reasonable time, he retains the goods without intimating to the seller that he has rejected them."

Again it is said in Dean v. Vaccaro & Company, 39 Tenn. at page 490:

"If the goods are delivered to a drayman, cartman, or any one else not authorized by the consignee to receive them, it is at the risk of the carrier."

While it is admitted that the barge load of material did come into the Wilson reservoir and did come in on Sunday about 5:15 A.M. it is a part of the proof by one Mr. W. E. Ross, who was in charge of the Wilson harbor at the time of the sinking of these vessels, that TVA never accepted delivery of leaking barges and to the same effect is the testimony of W. L. Daugherty, the yard foreman at the time, and neither did TVA assume any authority over leaking barges.

If the provisions in the contract to the effect that "title to the goods and risk of loss or damage shall remain in the Contractor until delivery in acceptable con-

dition by the carrier at destination'' means anything, it simply means that the duty of the carrier does not end until the goods are safely and properly delivered and accepted by someone authorized to do so.

In F. E. Grauwiller Transp. Co. Inc. v. Gallagher Bros. S. & G. Corp, 173 F (2d) 708 (2d Cir. 1949), the question of proper mooring of a scow was involved. The bargee in charge of that barge said that when it was moored it was in proper condition and shortly thereafter it was observed in a sinking condition. The question of the acceptance of the delivery was involved. The wind was high. On the question of delivery it was shown that the bargee went to the office and talked with some people there in the main office of the consignee and was informed that the boss was not at the office at that time, and he said to some person found at the office with reference to the scow, which had the name of Sherlie, that ''scow Sherlie is here with sand and gravel'' and that this person he was talking to first looked at him and said ''All right, all right, Captain, and I walked away.'' In that case it is said:

''Delivery is a mutual transaction which requires the consent of the person who is to take possession, as well as that of the one who gives it. It is true that tugs often delivered scows to the pier at times other than those for which they had been ordered, and certainly the exact time was not of the essence. Indeed we need not say that delivery of a barge during working hours in a safe berth was not within the implied consent of the Henry Company, as the business was conducted; perhaps it was part of the understanding that that company would assume

responsibility for such barges. This was not such a delivery; not only was it out of hours, but it was to the last degree perilous, as the event proved. If the tug would discharge itself of its duty, it was bound in such circumstances to secure an express acceptance, and there could be no acceptance except by an employee authorized by the Henry Company to accept. The maundering of the Sherlie's bargee was utterly inadequate for the purpose. If a tug master chooses to leave his charge wantonly exposed to destruction, he will not relieve his principal by sending an inarticulate bargee to announce what he has done to whomever he may find about the premises.''

Counsel for Serodino also rely upon the case of the State v. Kelly, 123 Tenn. 556, 133 S. W. 1011, 36 L. R. A., N. S., 171. In the first place that case is a criminal case, and deals with the shipment and possession of intoxicating liquor. It was decided by the Court in 1910. That case states the general rule in Tennessee with respect to passing of title in contracts of sale, but it appears to us that counsel has failed to properly construe that part of the opinion of the Supreme Court in that case which relates to the facts in this case. In that case the Court said:

"The general rule in this state, with regard to the sale of personal property, is that the sale is complete and the title passes as soon as the parties have agreed upon the terms, and that delivery is not essential to the passing of title * * * (quoting several cases)''.

The opinion continues immediately:

"Of course, delivery may be made an express condition, and, under such a contract, the title does not pass until the delivery is made. (Quoting authorities.) So, prepayment of the purchase price may be made a condition with like effect. (Quoting authorities.) Likewise, when the goods are to be weighed or measured in order to separate them from a mass of similar kind, or to ascertain the quantity of goods, or amount due for them, the title does not pass until this is done."

The opinion goes forward to state the rule with respect to title and delivery by virtue of mail orders etc. but as applied to the facts of this case, we have stated the essence of that opinion. We construe that case to support the contention made by TVA, and to refute the contention made by Serodino.

Again it is said that the applicable rule of law governing the present case is stated in the opinion of the Supreme Court of Alabama, 103 Ala. 671, 16 So. 627 (1894) Capehart et al v. Furman Farm Imp. Co. In the briefs of Serodino and that of Parish that portion of the Capehart case, which is contended to support the position of Serodino and Parish, that title had passed to TVA is quoted as follows:

"Where the Seller contracts to deliver goods f. o. b. at the place to which they are shipped and pays the freight to such place on the arrival of the boat which the goods are transported at such place the Carrier ceases to be the Agent of the Seller and becomes the Agent of the Purchaser and the Seller cannot maintain an action against the Carrier for injuries to

the goods after such arrival and before they are unloaded."

A reproduction of that opinion is also a part of the record in this case and is Exhibit "B" to the brief. By that we do not mean as a part of the court record because it is simply a part of the brief that was filed by Serodino with the trial court below. With that statement in the briefs in this Court, it is then argued that since the delivery was to be made f. o. b. barges, Wilson Terminal, Wilson Dam, Alabama, it is clear that the title passed to TVA when it was delivered on the barge at that terminal.

Again we think that counsel has failed to give the proper interpretation to the opinion of the Alabama Court in the Capehart case, as applied to the facts of the instant case. In that opinion it is said:

"The bill of lading was forwarded to and received by the consignees. The goods were safely carried by the railroad company to Chattanooga, and there delivered to defendants, common carriers by Tennessee river transportation, to be carried to Guntersville, a point on the river. Defendants loaded these, with other goods, on a barge at Chattanooga, on which, towed by the steamer R. T. Coles, they were safely transported to Guntersville, where the barge was landed and moored."

Now had there been nothing else in that opinion it perhaps would have supported the construction and contention made by counsel for Serodino and Parish in this Court, but immediately following the above quote the opinion continues as follows:

"Several days after this landing, neither the barge nor the goods thereon having been removed, the loss or injury complained of occurred.

"It is gravely controverted by the parties whether or not, under the peculiar facts shown in evidence, the liability of the defendants as common carriers had terminated at the time the loss or injury occurred; but the defendants contend that, howsoever that may be, whether there had been or not such a constructive delivery to the consignees as destroyed the liability of the carriers as such, yet, under the contract between the plaintiff and Scott & Ray the contingency had happened upon which all title and ownership in the goods had passed out of the plaintiff, the consignor, and into Scott & Ray, the consignees, whereby, under the rule obtaining in this state, the consignees only can sue as owners. We think this contention is sound * * *. When, therefore, the plaintiff paid the freight charges and caused the boat to be landed at Guntersville, with the goods safely thereon, properly consigned to Scott & Ray, it completely fulfilled its contract; the carriers ceased to be its agents for the custody and care of the goods, and immediately became the agents of the consignees. The relations of the parties then became precisely the same, in effect, as if the contract of the plaintiff had been to deliver f. o. b. at Atlanta, and the loss or injury had occurred en route, before reaching Guntersville. * * * The whole theory of the plaintiff in support of this action is that the mere arrival of the boat at the landing, with the goods on board, and its stay there for several days, did not terminate the liability of defendants as com-

mon carriers, for the reason that, on the undisputed evidence, as between carrier and owner, delivery was not to be made by the carrier on board the boat, and hence the goods were not ready for delivery while they remained thereon, by reason of which consignees were under no duty to be there to receive them.''

The distinguishing difference is mainly in the statement ''with the goods safely thereon'' and with the further distinction that the goods in that Capehart case remained safely aboard those barges ''for several days'', while in the case at bar the phosphate was delivered in an admittedly leaking barge; it did not remain docked or anchored for several days, it was delivered and sank on the same day, as hereinbefore stated, and which was a non-working day at Wilson Dam, and the fact that barges had been tied up in the same manner on Sundays, and the product thereon later received and accepted by Wilson Dam Authority when the cargo was intact, does not change the legal relationship of the parties.

It is contended that because the witness W. L. Daugherty testified that the barges were brought in as usual and that they ''tied them up at the place they had always tied them up'', is sufficient to show delivery, coupled with the statements made by the witness Sharp who had received the instructions from Lt. Burelson verbally to be down at the docks, after Burelson had received that telephone message that the barges were leaking, and that he returned on two occasions thereafter but saw nothing to indicate that the water had come into the boat so as to reveal any dangerous condition.

It seems to us that it could not be misunderstood on the part of Parish or on the part of Serodino that TVA had a right to weigh and inspect these cargoes,—that is the phosphate, before it accepted same so as to vest it with title. We have quoted the pertinent parts of the contract which we think bears out that statement, and it is unnecessary to quote them again.

Under the title "Sales" 46 Am. Jur. Sec. 247, p. 425, subtitle "Right of Inspection", it is said:

"As a general rule, in the case of an executory contract of sale the buyer is entitled to a fair opportunity to inspect or examine the article or commodity tendered to determine whether it conforms to the contract, that is, whether it is such as was bargained for. If the article or commodity does not correspond in kind, quality, condition, or amount to that which he has contracted for, the buyer may reject it.

\* \* \* \* \* \*

"The Uniform Sales Act provides that 'unless otherwise agreed, when the seller tenders delivery of goods to the buyer, he is bound, on request, to afford the buyer a reasonable opportunity of examining the goods for the purpose of ascertaining whether they are in conformity with the contract'. \* \* \* 'where goods are delivered to the buyer, which he has not previously examined, he is not deemed to have accepted them unless and until he has had a reasonable opportunity of examining them for the purpose of ascertaining whether they are in conformity with the contract'."

Commenting on the question of title passing, possession etc. in volume of Am.Jur. on p. 426 under the

title "Inspection of Goods Shipped by Carrier," it is said:

"Even though the buyer authorizes or directs shipment of the goods by carrier, the mere delivery of the goods by the seller to a carrier is not necessarily an acceptance by the buyer, nor does it necessarily bind the buyer to accept them. It does not preclude the buyer from rejecting the goods if they are not in fact as ordered. Moreover, the buyer's reception of the goods from the carrier is not necessarily an acceptance of the title or quality; there may be an actual receipt without any acceptance. On the arrival of the goods at their destination, the buyer has the right to inspect them to ascertain whether they conform to the contract, and the right to inspect implies the right to reject them if they are not of quality required by the contract.

"Thus, when a vendor sells goods of a specified quality, but not in existence or ascertained, and undertakes to ship them to a distant buyer when made or ascertained, and delivers them to the carrier for the purchaser, the latter is not bound to accept them without examination * * * The general rule is that delivery of goods corresponding with the contract is a condition precedent to the vesting of the title in the buyer."

It must be remembered, as hereinbefore stated, we are not dealing with the proposition where there is no contract, or where there is the usual contract with respect to carriers, consignors, and consignees as related to the ordering of merchandise to be transported by such common carrier, we are dealing with transportation by car-

riers, but we are dealing with the purchase of goods or material, in this instance phosphate, under a specified contract between the parties, and the uses which apply at the harbors or rail stations etc. do not deprive the parties of contracting with such contingency that title will not pass until they are safely delivered, and in such safe condition when delivered as that a reasonable time may be afforded to remove them from the barges, as well as a reasonable time to make the analysis and determine whether they will receive the merchandise in accord with the provisions of the involved contract. A public contract growing out of the simple use of carriers is a far different matter from that of carriers delivering products under a specific contract with respect to safety, quality and quantity.

The Uniform Sales Act in its general provisions is the same in Alabama as it is in Tennessee and Section 47 of the Act is in effect in both Alabama and Tennessee. In Tennessee it is No. 1 in Sec. 47-1247 T.C.A. and in each state it is as follows:

"Where goods are delivered to the buyer, which he has not previously examined he is not deemed to have accepted them, unless and until he has had a reasonable opportunity to examine them for the purpose of ascertaining whether they are in conformity with the contract."

■ The provisions of the Uniform Sales Act could mean nothing less than that in cases such as we have before us, the title or property in the goods does not pass to the purchaser unless he has "inspected them" or until he has "accepted them" or he has been afforded a "reasonable opportunity" to inspect or examine, and

has not done so within such time as afforded a reasonable opportunity. Under the contract here involved, as it relates to the liability of TVA, we are constrained to hold that, when these barges were delivered into the reservoir, one of them at least was in a leaking condition and was then leaking; that they were tied up together, so that if the leaking barge sank or overturned, it would necessarily sink or overturn the barge that was tied to it; that in view of the fact that they were delivered at 5:15 on Sunday, a non-working day, TVA had not had a reasonable time to inspect or to accept without inspection the phosphate loaded on the barges; that the safety motor patrolman whose responsibility and duties we have hereinbefore set out, had no authority to accept the material on the barges in question, and that he did not do so; that the acceptance of the material sued for was therefore not made by TVA and the mere docking at its harbor of this phosphate, in a leaking barge, did not constitute a "safe" delivery so as to pass title to TVA.

Passing now to the assignment of error levelled at the action of the court by appellant Parish, strictly speaking the assignment of error is simply:

"The Chancellor erred in decreeing that the Suit as to Serodino be dismissed."

"At the time the barges sank and the Cargo was lost, there was in full force and effect a Contract whereby 'Serodino agreed to cover cargo with insurance of $8.50 per gross ton'. This provision of the contract with Serodino was not limited as to time."

In the argument of counsel for Parish as it relates to this particular assignment, it is said:

"1. The Contract as set out speaks for itself, is simple in form, and, although not drawn by Legal Counsel can be easily construed as to Par. 6 thereof.

"2. Parish does not deem it necessary to cite any Law relative to said Contract, but relies on the terms thereof for recovery against Serodino.

"3. Parish respectfully represents to this Honorable Court that a Judgment against TVA would not prevent a Judgment against both Defendants, even though he could have satisfaction from only one Defendant."

The contentions now made in this Court by Parish are somewhat of a puzzling nature. TVA filed its assignments of error and brief in this Court on July 18, 1962. Counsel for Serodino filed their reply to the assignments of error and brief of TVA on August 2, 1962. In this opinion at page 436 we have quoted what is said in that reply relative to the liability of either TVA or Serodino to Parish. On August 8, 1962 Parish filed a separate document which is styled "Reply Brief of Parish & Parish Mining Company, to Assignments of Error and Brief of TVA". On the same day Parish filed a separate document "Assignments of Error, Brief and Argument on behalf of Appellant Parish & Parish Mining Company" and on page 447 of this opinion we have set out that one particular assignment of error with the argument made by counsel in that behalf. Then on September 21, 1962, Serodino filed a reply brief to the assignment of error filed by Parish. In this latter document consisting of two sheets of paper, filed by Serodino, there is an effort made to get away from the statement contained in the original reply to the assignments of error of TVA, as quoted in this opinion, and in this last filed reply Serodino says:

"Up until this time the defendant, Serodino, Inc., has consistently taken the position that Parish and Parish Mining Company was entitled to recover against either T.V.A. or Serodino, Inc., and which of the two would depend upon whether a delivery, either actual or constructive, had been made of the phosphate.

"In view of the assignment of error of Parish Mining Company, Serodino must now change its position. Serodino's position now is that Parish and Parish is entitled to recover against T.V.A. but in event that the court should find that it was not entitled to recover against T.V.A. it would not be entitled to recover here against Serodino because Parish and Parish Mining Company relies upon only one assignment of error which was that the Chancellor erred in decreeing that the suit as to Serodino be dismissed because:

"1. At the time the barges sank and the Cargo was lost, there was in full force and effect a Contract whereby 'Serodino agreed to cover cargo with insurance at $8.50 per gross ton'. (Tr. 262, 263) This provision of the Contract with Serodino was not limited as to time."

Now Serodino, based upon the assignment of error by Parish as appellant, takes the position that there was no error in the dismissal of the cause as to Serodino because "1. The contract had expired." The reference is to the contract between Serodino and Parish as having expired. Said contract is as follows:

## "TRANSPORTATION AGREEMENT

"It is hereby mutually understood and agreed by and between Cecil Parish and Winfred Parish of Huntingdon, Tennessee, operating under a partnership known as Parish & Parish Mining Company, hereinafter for convenience referred to as the partnership and Serodino, Inc. of Cincinnati, Ohio, an Ohio Corporation, hereinafter for convenience referred to as Serodino, as follows:

"1. The partnership is presently engaged in producing Phosphate rock which is shipped from Tom's Creek, Tennessee to the Wilson Dam Chemical plant of the T.V.A.

"2. Serodino is engaged in river transportation between said points.

"3. For a period of six (6) months from the date hereof, the partnership will ship all its product between said points by way of Serodino.

"4. Serodino agrees to transport all of said shipments at the rate of $1.00 per gross ton.

"5. Both parties agree to accept the weights of the weighmaster at said Chemical Plant and payments shall be made upon receipt of the weights furnished by the weighmaster at the Chemical Plant.

"6. Serodino agrees to cover cargo with insurance of $8.50 per gross ton.

"7. The partnership is to load the barges at its own expense and is to care for the barges from the time they are left at Tom's Creek for loading until they have been loaded and are picked up by the towboat.

The unloading is to be done by the T.V.A. Chemical plant.

"IN WITNESS WHEREOF the parties have hereunto set their hands in duplicate this 5th day of Nov. 1955.

"PARISH & PARISH
MINING COMPANY "SERODINO, INC.

"By Cecil Parish "By Virgil R. Rader."
"By Winifred Parish."

■ It is our opinion that this case is before us here to be heard de novo as relates to all parties and for a proper decree in this Court which sits in such cases as did the Court below, one of equity.

It is the policy of the Courts to end litigation as soon as can be properly and correctly done and we see no good reason why this case should be remanded "to the Chancellor with instruction to enter a Decree in favor of Parish against Serodino," because Parish having appealed from the action of the Court in dismissing the case as to Serodino, and the proof having been offered as revealed by this record, there is no necessity to refer this case for an additional decree by the Chancellor.

On May 1, 1956, Serodino notified Parish by letter that "as of May 5, 1956, rate for towing phosphate from Tom's Creek to Wilson Dam will be $1.50 per gross ton payable immediately upon receipt of invoice." There is nothing in the notice dated May 1, 1956, that could be construed to mean that the contract was cancelled as to any future shipment of phosphate accepted by Serodino or changed other than as to the rate per ton. The contract

itself had no particular termination date, it simply bound Parish, for six months, to ship all its phosphate between the two points by Serodino. Thus, when Serodino continued to send his barges in at Tom's Creek terminal, and to accept shipments of phosphate, it would be speculative indeed to determine that Serodino did not mean to carry what phosphate was offered to it for carriage at Tom's Creek by Parish under that same contract and its provisions, with the one exception, the charges to be $1.50 per ton.

We think it is further pertinent to a proper determination of the whole issue between all the parties that by the terms of item 5 of this contract between Parish and Serodino were "payments shall be made upon receipt of the weights furnished by the weighmaster at the chemical plant", clearly shows that both Serodino and Parish were construing the part of the contract which had been entered into between Parish and TVA relative to weights to be determined by the Wilson Dam plant "weighmaster", and bills submitted upon those weights. So it is, as we see it, that both Serodino and Parish understood the weight was to be determined by TVA, and of course, BPL was to be determined by TVA as well. Serodino, however, had nothing to do with the BPL content.

■ Notwithstanding the fact that Serodino now by his contention in his reply brief that he must now change his position, it seems to us that it cannot "change horses in the middle of the stream." He made no such defense in the lower Court; made no such in this Court until after there had been an assignment filed by Parish, the effect of which simply meant: "The Chancellor erred in de-

creeing that the suit as to Serodino be dismissed," and it would be inequitable to let it do so now.

Considering that there is no liability on the part of TVA for reasons set forth in the foregoing part of this opinion, we now consider the question of the negligence of the carrier and the effect of that negligence upon the destruction of the phosphate when these barges sank as hereinbefore shown.

In this case, and applicable both to the defense of TVA and to the right of Parish to recover from Serodino, we have to give consideration to circumstances as well as to the positive testimony in the case. And we have to give further consideration to the fact that no deckhand, pilot or any other person who was with that cargo of phosphate from the time it left Tom's Creek until it reached and sank in the Wilson Reservoir testified in this cause. They were the only ones who could have given the Court the facts about the leaking barge; how the water was pumped out, and why they left it unattended. Arrow was "Serodino" as admitted by Serodino, and we assume Serodino was in position to produce such proof and failed for some good reason to do so known to it.

If there was no danger existing at the time with respect to one of these leaking barges there would have been no telephone call. There was a telephone call; there was a leaking barge coming up the river, this barge went into the reservoir, the two barges were tied together; the barges overturned within a few hours after being set in the harbor and the phosphate was spilled upon the bottom of the harbor; the towboat left immediately when the barges were placed in the harbor; no deckhand or any other person was left with this tow of barges; a pump

was used to pump water from the barge that was leaking; that pump was removed by the deckhand and that deckhand makes no explanation of why he took that pump from that barge, and was not produced as a witness, as hereinbefore stated. Sharp saw that action, and all of this coupled with the fact that the barges did sink, is circumstantial evidence of a fact that the sinking was due to the leaking of the barge which had begun in transit and quite some time before they ever reached the harbor of Wilson Reservoir, and could not have been caused by any act of TVA after docking.

A case is made out by direct evidence, circumstantial evidence or by combination of direct and circumstantial evidence. Everett v. Evans, 30 Tenn. App. 450, 207 S. W. (2d) 350, 352; Ross v. Griggs, 41 Tenn. App. 491-498, 296 S. W. (2d) 641. Circumstantial evidence is defined by Professor Prosser in his action on Torts—1941—at page 291 as follows:

"Circumstantial evidence is evidence of a fact or set of facts from which the evidence of another fact may be reasonably inferred. It involves not only the assertion of witnesses as to what they have observed, but a process of reasoning by which a conclusion is drawn. Negligence may, of course, be proved by circumstantial evidence. The testimony of eye witnesses of the actor's conduct is not required and it may be inferred from the proof of other facts and circumstances."

It simply means, as has been held in many cases, that a fact can be proven by direct testimony, by circumstantial evidence or by a combination of both, and when such evidence is of such strength that from it a fact can

be found, then from that fact an inference may be drawn with respect to the negligence of an actor.

 Applying the rule then to the facts and circumstances revealed in this cause there is no escape from a determination that Arrow was negligent and by admission and contract with Parish Serodino is liable for all damage resulting from such negligence.

██ The Chancellor found that the salvaging done by TVA was done under the original contract in mitigation of damage. Our question No. 3 on page 4 in that regard will now be answered.

Immediately when the proper authorities of TVA discovered that the barges involved were overturned, on that Monday—as soon as Sunday had passed and plant opened for work, telephone conversations were had between Mr. D. R. Virtue, Superintendent TVA Chemical plant at Wilson Dam and Serodino. By that telephone conversation it is clear that Serodino entered into a contract with TVA, separate and apart from any contract that Parish had with TVA, to salvage the phosphate that was then at the bottom of the harbor. Following that telephone conversation the next day, May 28, 1956, Serodino by its president, wrote directly to Mr. D. R. Virtue, Superintendent TVA chemical plant at Wilson Dam, Alabama, saying:

"Confirming our telephone and wire of present date. This is your authority to salvage and charge to our account phosphate discharged from Barges D-92 and D-96."

On the same date Serodino wrote to Mr. Ross, Tennessee Valley Authority Chemical Plant, Wilson Dam, Alabama, in which Serodino said:

"This will be your authority to charge to our account any labor or material used in salvaging barges D 92 and D 96 which work will be performed by Merrill Marine Service of St. Louis, Mo.

"We greatly appreciate your cooperation."

The record shows that TVA immediately procured the services of Merrill Marine Service of St. Louis and salvaged everything that could be salvaged of the involved phosphate. After it was taken from the harbor, cleaned, graded, et cetera and after the paying for labor and material, as per above letter, necessary to remove it from the bottom of the harbor, there was left a balance of $1665.10, and Parish received that amount for it was paid to its assignee, the defendant Bank and Parish. Correspondence clearly shows that this whole situation involved a separate, new and distinct contract between TVA and Serodino relating to the removal of the phosphate from the harbor after it had sunk, in the manner stated, to the bottom of the harbor, and it was not a question of the TVA having taken upon itself to salvage the phosphate in order to minimize the damage, under the old contract. It was a clear case of TVA doing everything it could to save as much of the loss to Parish or to Serodino or to Arrow, whichever concern it might fall upon. And Serodino being the carrier, was the proper one with which TVA made the contract and Serodino approved it fully, and while the net of $1665.10 is for the benefit of Parish, likewise it reduces the liability of Serodino by that same amount. Furthermore, the proof

shows that this phosphate and the overturned barges were interfering with the use of the harbor and both phosphate and barges had to be removed as soon as possible. This contract between Serodino and TVA to remove the phosphate from the harbor is another circumstance which shows Serodino was then of the opinion that it was bound for the destruction of the phosphate.

Even if Serodino had the right to change its defense as against Parish from that stated in its original answer to the Parish complaint and in its brief in reply to the assignment of error by Parish, so as to rely upon what is alleged by it to be a contract which had expired between it and Parish, that could not in any wise change its liability in this cause, for whether it was hauling under the contract which it had made with Parish or whether it was hauling as a common carrier as relates to the rights of Parish and Serodino, it is clear from the circumstances and the proof that there was negligence on the part of the carrier which brought about the destruction of this phosphate and certainly Serodino must be liable for the loss to Parish.

The question then is how much is that loss? On page 2 of this opinion we have set out the amount which Parish claims would be due him by Serodino in event the loss falls on Serodino, which is "$6,055.35." From the bill and from the proof it can be ascertained that this amount was arrived at after deducting $1665.10, which Parish had received as salvage.

It is proven by Parish that at the time these barges were loaded they contained 1040.2 tons. It is also proven by Parish at the time they left Tom's Creek dock in Perry County that the BPL content of the phosphate

was 67 or above, which binds Serodino to the payment on that basis, so that based upon their figures, Parish and Parish are entitled to recover the amount of tons, which is 1040.2 times the price that was being paid by TVA, and which Serodino had agreed to insure and which would amount to $8,841.70. Having received $1665.10 already from the salvage, this amount deducted from $8,841.70 would leave $7,176.60. Now as a matter of fact the phosphate, as we have held, was never safely delivered, but in recovery from Serodino by Parish, Serodino would be entitled to a deduction in the amount of the freightage on that 1040.2 tons, or stated in other words, Parish would not be entitled to recover the entire value of the phosphate and then not account for freight charges as agreed upon. So the 1040.2 tons at $1.50 per ton freight would make the carrying charges $1,560.30. Thus $7,176.60 minus the carrying charges of $1,560.30, leaves a balance due to Parish as of the date of the shipment of $5,616.30, which is less than the amount it claimed to be due in its original bill, if paid by Serodino.

The question of interest has given us some concern, but in the light of this record, with no persons having testified except Parish brothers and the witnesses for TVA, equity requires that Parish recover interest on this principal of $5,616.30 from the date that the carriage failed, which was on Sunday, May 27, 1956.

The result is, and we so find, that the proof preponderates against the decree of the Chancellor awarding a judgment in favor of Parish and against TVA, and dismissing the bill as to Serodino. The decree should have been in favor of Parish and against Serodino for the aforesaid sum of $5,616.30, together with interest thereon

from the 27th day of May 1956, and the bill against TVA dismissed. Thus, it is that the assignment of error by Parish, as an appellant, is sustained, the decree of the Chancellor dismissing the cause as to Serodino, reversed and decree in favor of Parish against Serodino, as stated herein, will be entered. Likewise the assignments of error by TVA in its appeal from the verdict of the decree of the Chancellor awarding judgment against it, are sustained, the decree of the Chancellor reversed and the cause is dismissed as to TVA.

Exercising the authority to assess the cost where we think it should be equitably assessed, Serodino will be taxed with all the cost in the cause in the Chancery Court, and with one-half the cost of the cause in the Court of Appeals. Parish & Parish will be taxed with one-half of the cost in this cause in the Court of Appeals.

Decree will be entered in accord with the foregoing opinion.

Carney and Bejach, JJ., concur.