# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
November 28, 2012 Session

## MARISA R. ROWLAND ET AL. v. METROPOLITAN GOVERNMENT OF NASHVILLE & DAVIDSON COUNTY ET AL.

**Appeal from the Circuit Court for Davidson County**
**No. 04C2916      Hamilton V. Gayden, Jr., Judge**

---

**No. M2012-00776-COA-R3-CV - Filed February 28, 2013**

---

In this case involving serious injuries sustained in a collision between a school bus and a pickup truck, the evidence preponderates against the trial court's findings. We must, therefore, reverse the trial court's judgment in favor of the plaintiffs.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which PATRICIA J. COTTRELL, M.S., P.J., and RICHARD H. DINKINS, J., joined.

James E. Robinson and Kathryn E. Sinback, Nashville, Tennessee, for the appellant, Metropolitan Government of Nashville and Davidson County.

Steven Rand Walker, Oakland, Tennessee, and Mark S. Beveridge, Nashville, Tennessee, for the appellees, Marisa R. Rowland et al.

## OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

Marisa Rowland and Julian Rowland, students at Dodson Elementary School in Hermitage, Tennessee, were passengers in a school bus on the afternoon of October 10, 2003 when the bus was hit by a pickup truck. The Rowland parents, individually and on behalf of their children, filed this lawsuit on October 7, 2004 against a number of defendants, including the Metropolitan Government of Nashville and Davidson County ("Metro"); the board of education; Sherrie Rogers, the school bus driver; Gerald Stanley, the driver of the pickup truck; and five corporations involved in the design, manufacture, and/or sale of the school bus. The trial court granted Metro's motion to dismiss the school bus driver and the

board of education. The plaintiffs reached settlements with some of the defendants and dismissed their claims against the corporations and the truck driver. Thus, Metro was the only remaining defendant. As to Metro, the plaintiffs alleged negligence in failing "to exercise reasonable care to provide for the safety of children like Marisa Rowland being transported on its school bus," as well as vicarious liability for the negligence of Ms. Rogers.

In September 2008, Metro filed a motion for summary judgment on the ground that, based upon the undisputed facts, the plaintiffs could not establish their negligence claims against Metro. The court granted Metro's motion for summary judgment as to the claims regarding the structure of the school bus, but denied the motion as to the alleged negligence of Ms. Rogers, the bus driver, and Metro's training and supervision of Ms. Rogers.

*The trial*

The court heard the liability phase of the bifurcated trial on February 21, 2012. George Donn, a school transportation consultant, testified as an expert witness on behalf of the plaintiffs. Mr. Donn stated that Mr. Stanley, the truck driver, drove his vehicle over the center line and into the school bus.[1] When asked to give his opinion about the actions of Ms. Rogers, Mr. Donn identified a number of "question marks"—the fact that Ms. Rogers was not on the assigned route, the existence of "three crashes" (the truck hitting the bus, the bus running over a tree, and the bus hitting a tree), the presence of a "boom box" in the bus, the fact that Ms. Rogers was holding a soft drink can between her legs at the time of the accident, and the fact that Ms. Rogers did not remember whether she applied the brakes. Mr. Donn testified that, "when you put all those things together, I think it became a red flag that we needed to look into the details."

Mr. Donn had reviewed Metro's bus driving manuals and found "no fault whatsoever with their manuals." The manuals required a bus driver to seek authorization from the dispatcher or a supervisor before deviating from the assigned route. (It is undisputed that Ms. Rogers did not seek approval prior to modifying the route she took on the day of the accident.)

Mr. Donn testified about North New Hope Road, the road on which the accident occurred, which was not part of Ms. Rogers's assigned route. The evidence was that Ms. Rogers chose to drive on North New Hope Road in order to save time because of heavy traffic. Mr. Donn described North New Hope Road in 2004 as a narrow rural road with trees growing close to or over the road at some points. He characterized the site of the accident as having "limited visibility" from the pickup driver's direction of travel. Mr. Donn gave the

---

[1]Mr. Stanley's fault is not in dispute in this appeal.

following opinion as to the appropriateness of a school bus using North New Hope Road:

> If there are children on North New Hope Road that need to be picked up, I think I would rather put them on a bus than have them walk down that road, because I think the road is dangerous. And I would do that in my position as the director of transportation. However, I would not use that road as a cut-through road or road trying to make up time and speed to get from one school to another. . . . It sounds like the need to get to the second school was paramount [in Ms. Rogers's decision to take an alternate route].

Mr. Donn testified that he did not know whether the fact that Ms. Rogers had a drink between her legs affected her ability to apply the brakes, but that the presence of the drink "puts a red flag in front of me." He also did not know whether the boom box had any effect on what happened and whether it came untethered after the truck crashed into the bus, but it caused him to have concern that Ms. Rogers was not following the school rules for bus drivers.

As to Metro's training and supervision of Ms. Rogers, Mr. Donn opined that Metro had "done a very good job of outlining everything drivers need to be doing" as well as what they should not be doing. He assumed that Metro had taught the same information to the drivers. Mr. Donn stated that, "I think if she had followed the manual and the driver procedures, basically we wouldn't be in here today."

On cross-examination, Mr. Donn acknowledged that he did not know whether Ms. Rogers applied the brakes and that the initial collision would have occurred whether or not she applied the brakes. He stated that, "based upon what I read, more likely than not that she did not apply [the brakes]." Mr. Donn further stated: "I would say based upon the information that has been provided to me that there was no indication she made any effort to steer, to eliminate trying to hit the trees or tried to brake after the initial collision. I saw nothing from anyone that said she did." Mr. Donn opined that, from the point when the pickup truck struck the bus, "there are things that Ms. Rogers may or may not have done that could have impacted the rest of the accident."

The plaintiffs' next witness was Stephen Felts, a resident of North New Hope Road whose driveway was located close to the accident site. Mr. Felts described the relevant part of North New Hope Road as having "two up-and-down hills that really obscure vision." He further stated that, at the site where the accident occurred there was a "deceptive" curve in the road: "As you're approaching it from either direction, it doesn't appear to be that much of a curve, but when you get into it, it really can't be well negotiated if you're exceeding the speed limit for sure." Bobby Luffman, a resident of North New Hope Road since 1987

whose yard bordered the curve, also testified. He was aware of three fatal accidents and at least 15 other wrecks at the curve during the time that he had lived there.

Sherrie Rogers, the bus driver, was called by the plaintiffs to testify. She admitted that, on the day of the accident and for about three weeks prior to the accident, she had followed an alternate route when leaving the school in the afternoon to take students home. When following the assigned route, she had been about 30 minutes late getting to the next school and had been advised by other drivers of a better route. Ms. Rogers did not ask permission to change the route although she was aware of the policy requiring her to do so.

Ms. Rogers could not say how fast she was going at the time of the collision, but she did not dispute the opinion of the school safety investigator that she was traveling about 30 miles per hour. Ms. Rogers did not know whether she hit the brakes. According to Ms. Rogers, the boom box radio was tethered to the front part of the bus. She admitted having an open drink bottle between her legs at the time of the accident. As to what happened when the pickup truck hit the bus, Ms. Rogers testified:

> Q. Now, and as I understand it, when the truck hit your bus, it hit—the front of the truck hit the left front of your bus, correct?
> A. Yes, sir.
> Q. And the pickup truck kind of stopped right there, didn't it?
> A. I remember it spinning.
> Q. Your bus kept going to the right, correct?
> A. Yes, sir.
> Q. And you ran over a small tree or bush and then came to rest up against another tree?
> A. I don't remember the first tree. And from my recollection, I didn't touch that other tree. I thought I stopped right before that tree. But that's just what I remember.
> Q. Do you know why your bus didn't stop sooner?
> A. I can't answer that.

Ms. Rogers further testified that, after the accident, Marisa was on the floor of the bus unconscious; "her head was facing towards the back door and her feet [were] facing toward the front of the bus."

On cross-examination, Ms. Rogers testified that, while she could not say her exact speed at the time of the accident, she knew she was going under the posted speed limit of 35 miles an hour. When she saw the pickup truck coming toward the bus, Ms. Rogers "braced" by gripping the steering wheel to maintain control of the bus. As to whether or not she

-4-

applied the brakes, Ms. Rogers gave the following testimony:

> Q. You have testified in the past, as [plaintiffs' attorney] pointed out, that you didn't remember when you hit the brakes. Do you recall now in retrospect whether you hit the brakes or not?
>
> A. Thinking back, seems like I remember hitting the brakes when I was in the yard.
>
> . . .
>
> Q. [Showing a picture of the accident]. This is a different angle than the picture that [plaintiffs' attorney] showed of the bus, but it's the same accident scene. There's a space you'll see here between the bus and the tree. Does it appear—from this picture, is this an accurate representation of what the bus looked like after the accident?
>
> A. Yes, ma'am.
>
> Q. And looking at that, do you recall anything about that tree, thinking anything about that tree?
>
> A. Yes. "I got to stop."
>
> Q. I'm sorry?
>
> A. "I got to stop."
>
> Q. You thought "I got to stop before I hit that tree"?
>
> A. "I just have to stop" when I seen the tree.
>
> Q. Okay. And somehow, and you may not remember exactly, but somehow your bus did stop before hitting that tree; is that correct?
>
> A. Yes, ma'am.
>
> . . .
>
> Q. . . . [Y]ou didn't impact any trunks like this prior to coming to rest before this tree?
>
> A. I don't remember running over anything.
>
> Q. Okay. Fair enough. The bus, it went—I mean, I'm sure when the truck hit, you may not have had a lot of control over where the bus went; is that correct?
>
> A. I felt like I did.
>
> Q. Did you?
>
> A. Yes, ma'am.
>
> Q. Did you maintain control to the best of your ability?
>
> A. Well, it knocked me—when he hit, it knocked me. And I do feel like I had control of that bus until I stopped. Yes, ma'am, I did.
>
> Q. Did you keep your hands on the steering wheel the entire time?
>
> A. Well, I did the entire time. I know at the end, I didn't know my hand was injured.
>
> Q. Okay. So your hand was injured in the wreck?

A. Yes, ma'am.
Q. Do you recall gripping the steering wheel tightly?
A. Yes, I do.

Ms. Rogers went on to testify that the drink bottle between her legs did not distract her or keep her from having control of the bus, and that the boom box did not have any effect on the accident. After the accident, her drink was on the floor and the boom box "was still sitting where it was bound."

Gwen Sales, the school safety investigator assigned to the accident on October 10, 2003, acknowledged that Ms. Rogers had violated the policy of getting prior approval for any route changes. She further testified:

She did not do as we asked, but under certain circumstances, if something is preventing the driver to go that direction or they're asked not to go that direction, they have an option to use good judgment to go a different way.

Ms. Sales subsequently testified as follows:

A. Like I said, they can [go off the approved route] if there's something preventing them from going, you know, from traveling the roads that were given on the route sheet, they can do that. But they are not really—it's not really a real big violation. It's not a violation to alter the route. Some of them do it for traffic or other reasons, but . . .
Q. Okay. So you're saying it's not important to Metro if the bus drivers decide they're not going to follow this procedure and they just decide they want to go a different road?
A. They have to follow the route sheet, but under other circumstances, they can go off the route for different reasons. And I'm just saying she might have tried to call in and the radio might have been tied up or something.

Ms. Sales admitted that she had initially expressed to her colleagues some concern about the bus being off the approved route at the time of the accident because North New Hope Road was a winding, hilly two-lane road.

Ms. Sales described her observations at the scene of the accident. Her recollection was that the boom box had not been secured when she arrived at the scene about 15 to 20 minutes after the accident. Ms. Sales opined that Marisa may have struck her head on something metal on the handle of the front door of the bus; she based this theory on her observation of some blood on screws by the door handle. On cross-examination, Ms. Sales

acknowledged that her job as a school safety investigator was to gather and disseminate information about the accident, make sure those involved received needed medical attention, inform the school about the police investigation, and act as a liaison. She had not been trained to reconstruct the accident or to determine the cause.

Ms. Sales gave the following testimony concerning North New Hope Road, Metro bus routes, and the accident:

Q. Okay. As a safety investigator, you make recommendations on safe routes, on trying to make sure the routes are safe. Have you ever made a recommendation to take North New Hope Road off of the MNPS bus routes?
A. No, I haven't.
Q. And it's a lot like other routes, other roads that people drive on MNPS bus routes?
A. We have routes—different road conditions that are worse than that one, but we have to travel them in order to pick up the students that live there.
Q. But even if you had to go pick up students, if there were a road that was just really inherently dangerous, you wouldn't let the buses go down that road as a safety investigator; is that right?
A. That's left up—we're giving feedback to the routing specialist, that we would just actually tell them maybe something that we felt is dangerous about proceeding through that particular area.
Q. But you never did that with North New Hope Road?
A. No, I did not.
Q. And are you familiar with the other routes [on the approved route], the Old Hickory Pike and Central and Andrew Jackson?
A. Yes.
Q. Are there dangerous spots on those roads as well?
A. Yes. Dangerous spots and a lot of accidents that occur and a lot of congestion of traffic in that area.
Q. So when you're saying that you would have gone one way as opposed to the other, that's just your opinion; is that right?
A. Yes.
Q. In your report, or in your investigation, you determined that there was nothing that Sherrie Rogers could have done that would have prevented Gerald Stanley from crossing the double yellow line and crashing into her bus; is that correct?
A. Correct. She did not—she did all she could to control the bus.

At the close of the plaintiffs' proof, Metro moved for dismissal on the ground that the

plaintiffs had shown no right to relief. The trial court denied Metro's motion, and Metro began putting on its proof. Sergeant Chris Upchurch, the Metro police officer and trained crash investigator who was dispatched to the accident on October 10, 2003, testified about his observations at the accident scene. Sergeant Upchurch opined that Mr. Stanley's excessive speed and the condition of his tires caused his pickup truck to hydroplane and crash into the school bus. Based upon his investigation, Sergeant Upchurch concluded that Ms. Rogers was not speeding before the collision and that she "had no contributing factors in the crash." Asked if North New Hope Road was appropriate for school buses to use, the sergeant responded affirmatively. He stated that he "didn't see any safety issues"; he noted, in particular, "the width of the roadway and each lane is wider than that of a vehicle and the bus." He did not think that the curve where the accident occurred or the hilliness of the road made North New Hope Road inappropriate for use by school bus drivers. Sergeant Upchurch further testified that, based on his investigation, the presence of the boom box radio or a soft drink bottle did not affect or cause the accident.

Sergeant Upchurch also gave the following testimony about his conclusions concerning the causes of the accident:

Q. Are you aware of anything that Ms. Rogers should have done that she didn't do in either avoiding the collision between her and the school bus and the pickup truck, or in avoiding some other collision once the bus left the road?
A. No, sir. My conclusion was the bus driver had zero, meaning no contributing factors to the crash at all. Doesn't matter what she would have done; the crash would have occurred. So no, sir, I don't know if there was anything else she could have done. Even swerving to avoid the accident, the crash still would have occurred.
. . .
Q. Sergeant Upchurch, are you aware of any law that the bus driver broke or violated by being on North New Hope Road?
A. No, sir.
. . .
Q. Now, from your investigation, did you form a conclusion as to what or as to how Marisa Rowland was injured on the bus?
A. Did I form a conclusion?
Q. Yes.
A. It appeared that she struck the—was thrown to the front of the bus, which is common when an impact occurs to have something loose hanging out or if there's something that can go forward, it goes towards the impact. Whatever object it is, it goes towards the impact. And it appeared that she was thrown

up in that direction and hit the door handle that opens up the bus door for the children to get on and get off.

Q. So from your investigation, there was no indication that a radio hit Marisa Rowland?

A. No, sir. There was evidence that I saw there that suggested she hit that door.

Mr. Stanley, the pickup truck driver, was the next witness for the defense. Mr. Stanley stated that he did not remember the details of the wreck and that the statements he made to a Metro police officer about six days after the accident would provide a more accurate account of what happened. Whereupon, a recording of Mr. Stanley's previous conversation with the Metro officer was played. In that conversation, Mr. Stanley admitted that he had been driving too fast, that his tires were in poor condition, and that his vehicle went across the center line and collided with the school bus.

When called by Metro to testify again, Ms. Rogers reiterated that the boom box was secured by hooks connected to latches on either side of the "doghouse," a reference to the engine compartment. She testified that the radio never left the doghouse and that she saw it there after the accident.

Todd Hutchison, an accident reconstructionist, testified as an expert for Metro. He opined that Mr. Stanley's pickup truck was going too fast around a curve on wet pavement, skidded in to the other lane, and crashed into the school bus. He testified that, based upon his investigation, the school bus had been traveling at an appropriate speed for the conditions and the road it was on. Mr. Hutchison did not find that the school bus driver had done anything improper; he did not find any evidence to suggest that the school bus driver had been distracted or failed to react appropriately. According to Mr. Hutchison, the accident was caused by Mr. Stanley leaving his lane of traffic and colliding with the school bus, not by anything Ms. Rogers did or did not do. The evidence showed that the school bus was within its lane of traffic right before the collision. In fact, "there was evidence that the school bus even moved over to the right side of the lane . . . ." On cross-examination, Mr. Hutchison opined that the school bus did not actually impact the trunk of the tree near which it came to rest.

The final witness was Tracey DeMoss, routing/special services coordinator for Metro's transportation department. She described the process by which Metro determined the routes prescribed for its school bus drivers. After explaining that Metro sometimes designates a street as "no travel," Ms. DeMoss further testified:

Q. And was North New Hope Road one of those flagged roads?

A.  No, ma'am.

. . .

Q.  Do you know how many routes you had that were routed by EDULOG [a computerized routing program] to go down that road?  Or by routing, I should say, since it's human and computer, to go down North New Hope Road?

A.  At the time of this accident?

Q.  Yes.

A.  There were two runs.  A high school run and an elementary run who was designated with stops on North New Hope Road.

Q.  Okay.

. . .

Q.  Technically—and the Plaintiff will ask you about, I'm sure, the policies of calling and requesting—I think there's two policies.  One is that you should call and request permission from a supervisor or dispatcher before altering your route, before changing your route.  And the other one is, if you were going to alter your route, make it go through the EDULOG system to alter it.  Can you describe those two policies for me?

A.  Those policies in particular, as far as with the EDULOG, clearing it with routing, that is more specific for if you are—if there's a need to change your route on a permanent basis, you need to turn in a route update, come in and talk to someone in routing so that it can be changed officially on your route.  If you are altering based upon—usually when a driver will call in by radio that I'm having to change my route, it's generally traffic purposes.  And, of course, they're the ones who are out there.  If a driver calls in to, you know, "I need to change" or "I'm going a different way," then they are the ones who are out there, they know what the situation is.  Dispatch would generally say, "That's a 10-4, be careful, use caution," depending on what the situation is.  Having worked in dispatch, I don't know of any time that we've ever told a driver, "Oh, no, you can't change your route."  And most of the time whenever someone calls in, it's if it will affect dropping off students.  Say there's an accident at the end of a road and they can't go down it and they have stops down there, they'll call us to let, you know, let someone know that they can't get down there, they're going to have to come back with a child or make arrangements for the child to get off, you know, maybe at a different location than normal.

Q.  As a dispatcher, would there have been any reason that you would have told someone calling in not to go down North New Hope Road?

A.  No.

Q.  What type of discretion do you leave to your bus drivers?

A.  Well, we depend a lot on the bus driver's judgment.  Like I said, they're

-10-

the ones who are out there. They're the ones ultimately responsible for the bus. So, you know, we have them use their discretion and judgment on a daily basis.

Q. Would a bus driver be disciplined for failing to call in if they went a different route or a different way to their first stop on their route?

A. No.

Q. Why not?

A. Well, I've never really been asked the question, but my feeling on that is we don't know from day-to-day what the situation is out on the road. The driver is out there. So sometimes they have to make a judgment call. Sometimes—especially in years past when we had one radio for—at one time it was for all buses, we had one radio system, and unless there was just an extreme emergency, it was hard to even get on the radio to get through because there were so many people calling for different reasons on the radio. . . . But to just go a different road, a different street because of traffic or a tie-up or something, that just wouldn't warrant discipline, I don't believe. Technically, according to what's in the handbook, yes, it could be considered a violation, but not one that would warrant discipline, I don't think.

. . .

Q. Have any of your safety investigators or anyone else ever recommended removing North New Hope Road from bus routes?

A. No. Not to my knowledge at all.

Q. Do you sometimes have to send buses down roads that have curves and hills and have had accidents?

A. Yes. There are many roads in Davidson County that buses go on that meet that criteria.

Q. Was North New Hope Road appreciably different in any way than bus routes that you send buses down every day in Metro Nashville Public Schools?

A. No, ma'am.

*Decision of trial court*

At the conclusion of the proof on liability, the trial court ruled that Mr. Stanley was 75% at fault and Metro was 25% at fault. The court's findings will be discussed below as pertinent to the issues on appeal. After the damages phase of the trial, the court entered its final judgment in which it found total damages for Marisa in the amount of $2,000,000 and for Julian in the amount of $30,000. Based upon Metro's 25% liability and the statutory

maximums allowable under the Governmental Tort Liability Act,[2] the court found Metro liable to Marisa for $250,000 and to Julian for $7,500. The individual claims of the parents were dismissed.

*Issues on appeal*

On appeal, Metro argues that the trial court erred (1) in ruling that Ms. Rogers breached her duty of care and that her actions were the direct and proximate cause of the accident, (2) in applying the wrong standard of care, (3) in considering and entering into evidence certain deposition transcripts and associated exhibits of witnesses who testified at trial, and (4) in applying the missing witness rule.

STANDARD OF REVIEW

In an appeal of a decision rendered after a bench trial, we review the trial court's findings of fact de novo with a presumption of correctness unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). Moreover, we "give great weight to the trial court's assessment of the evidence because the trial court is in a much better position to evaluate the credibility of the witnesses." *Boyer v. Heimerman,* 238 S.W.3d 249, 255 (Tenn. Ct. App. 2007). We review questions of law de novo with no presumption of correctness. *Nelson v. Wal-Mart Stores, Inc.*, 8 S.W.3d 625, 628 (Tenn. 1999).

ANALYSIS

I. *Standard of care*

Metro argues that the trial court erred in applying the standard of care applicable to common carriers.

There is no dispute in this case that the appropriate standard of care for school bus drivers is not the standard of care applicable to common carriers. Our Supreme Court has made clear that a school system does not have the same duty of care as a common carrier, which must exercise the "highest practical degree of care." *Hawkins Cnty. v. Davis*, 391 S.W.2d 658, 663 (Tenn. 1965). Rather, a school bus driver has a duty "to exercise reasonable and ordinary care under the circumstances." *Traylor v. Coburn*, 597 S.W.2d 319, 321 (Tenn. Ct. App. 1980). When a school bus is transporting young children, reasonable and ordinary care under the circumstances "requires that the driver exercise special care proportionate to

---

[2]Tenn. Code Ann. § 29-20-101 *et seq.*

the age of the child and its ability, or lack of ability, to care for itself." *Hawkins*, 391 S.W.2d at 660.

In support of its argument that the trial court erroneously applied the common carrier standard of care, Metro relies solely upon a single statement made the by the trial court. The statement, italicized below, was made in the context of the court's discussion of what caused the accident:

> But the speed of the car, speed of the bus, was a contributing factor to this case, and therefore, the Court finds that Metro Government violated some standard of policy and procedures. The Court finds that it was *a high duty, not only as a driver of a school bus, but also similar to that of a common carrier*, and the procedure has to be followed. It was not in this case. It was not followed on the route for three weeks. Never was changed even afterwards, which the Court takes into evidence.

(Emphasis added). The "procedures" referenced by the court appear to be Metro's assigned school bus routes. While the trial court's language here is somewhat confusing, the court stated that Metro's duty was "similar to that of a common carrier," not that Metro had the same duty as a common carrier. In the absence of any other support, we find Metro's argument here unpersuasive.

## II. *Missing witness rule*

Before proceeding further with the negligence analysis, we must resolve the issue of the trial court's application of the missing witness rule.

Some background is necessary to understand the issue. During her deposition in July 2006, Ms. Rogers was questioned about a written statement she made on October 16, 2003 about the accident. When a two-page copy of the statement was presented to her at the deposition, there seemed to be something missing. At the bottom of the first page, the following text appeared: "I could see Marisa face down in." At the top of the second page, the following text appeared: "screaming. I opened the door and two girls came running out of the house . . . ." Putting the phrase at the bottom of the first page with the word at the top of the second page yields the following: "I could see Marisa face down in screaming." At the deposition, Ms. Rogers stated that she did not recall how many pages were in her written statement, but that there may have been a page missing given the fact that the above sentence

-13-

appeared to say that Marisa was screaming, which was not accurate.[3]

At trial, during Mr. Donn's testimony, the trial court asked whether he had seen Ms. Rogers's written statement and asked that a copy of the statement be produced by the parties. Mr. Donn testified that he thought he had seen a copy of the written statement in preparing for the trial. The trial court inquired about the original of the document, and plaintiffs' counsel stated that he did not think the original had been produced.

At the end of the plaintiffs' proof on liability, Metro moved for dismissal under Tenn. R. Civ. P. 41.02. The trial court denied the motion and made the following statements:

> Ms. Rogers could have been and probably was in her lane; however, the Court just can't get past, and I'm sorry that I cannot, that the Metro Government has a public duty to keep their records. It is a public record, and this record is deficient in some very key points.

> That raises a question of credibility, not only as to Ms. Rogers's testimony, which, by the way, I do not find her that credible, as opposed to Ms. Sales, who I do find extremely credible. If Ms. Sales says the radio was not attached and Ms. Rogers says it was, I believe Ms. Sales.

> Ms. Rogers was asked to draw a diagram of the accident, wherein there's another page of this missing to make these words fit. Where is it? So what we have, and unfortunately that is before us, is a finding of spoliation by the Court. Metro had a duty to preserve. It's not here. The Court cannot give Ms. Rogers credibility until I see that, based on the conflicting testimony between her and Ms. Sales.

> And I cite you to the case of Clark Construction v. City of Memphis. It's a 2005 case in the Federal District Court, No. 01-2780, where a similar question came up about the obligation of the city to preserve public records. So what we have here is an adverse inference. So the Court at this point relies on adverse inferences. This child had an unusual accident, and it could have been as a result of a missile, as well as anything else. Could have been as a result of the radio or glass bottle or something else.

The court then asked Metro to produce the original document. Counsel for Metro pointed

---

[3]Ms. Rogers likewise testified at the trial that these statements did not make sense and that perhaps there was a page missing.

out that no party had ever requested the original of the document in the five years since Ms. Rogers's deposition.

During its proof, Metro recalled Ms. Rogers to the stand and introduced into evidence a more complete copy of her written statement. This copy showed that the deposition copy had been missing a line from the top of the second page. The new copy showed the statement to say: "I could see Marisa face down in between the seats in the aisle. The other kids were screaming." Ms. Rogers testified that this copy represented her full written statement. She did not recall drawing a diagram of the accident location as requested on the form.

Later in the trial, Metro asked the court to reconsider its ruling regarding spoliation of evidence. Metro pointed out that it had not needed to introduce at trial the written statement that was attached to Ms. Rogers's deposition since Ms. Rogers was a witness at trial. No party had attempted to introduce the statement at trial. Moreover, Metro argued, the new copy was fully consistent with Ms. Rogers's testimony. Noting that it would have liked to see the diagram (if any) that Ms. Rogers might have drawn on the written statement, the trial court nevertheless granted Metro's motion to reconsider.

In making its ruling on liability, however, the trial court revisited Ms. Rogers's written statement:

> The fact that the accident report that she made to the Transportation Department does not show the original backside, the Court has backed off the spoliation finding. I do not back off the missing witness rule, that the backside of the document was very appropriate to the Court and is missing. *And there is an inference that she knew it was a dangerous intersection—dangerous curve. . . .* In fact, it could have been with the length of the bus and the fact that the bus was almost 10 feet in width and the lane was only 10 feet in width, physically from a physics' standpoint, that is, it could show that the bus was over the line, at least part of the bus. Even though Mr. Stanley went over the yellow line and hit this bus head-on, it could show that that bus could not negotiate that curve with that part of it being over the side. I'd love to see that diagram, which I don't have.

(Emphasis added).

With this procedural history in mind, we must determine whether the trial court properly applied the missing witness rule. In light of the fact that Ms. Rogers testified at the trial, there is no missing witness in this case, so we fail to see how that rule was applicable

here. Perhaps the trial court was actually referencing the missing evidence rule, which is similar to the missing witness rule. Either rule allows a trial court, under certain circumstances, to "instruct a jury that they may consider the absence of a witness or evidence to conclude the witness's testimony or missing evidence would have been adverse to the party who failed to introduce it." *In re Estate of Hamilton*, No. M2009-01882-COA-R3-CV, 2011 WL 532296, at *5 (Tenn. Ct. App. Feb. 14, 2011).

It is clear from the transcript that the trial court was bothered by the absence of the original of Ms. Rogers's written statement. Once the missing line from the top of the second page was revealed, the trial court questioned whether, as requested on the form on which the written statement appeared, Ms. Rogers may have drawn a diagram of the accident location on the reverse side of the first page. Even if the circumstances allowing application of the missing evidence rule had been met in this case, however, we fail to see how the absence of Ms. Rogers's original written statement, which may or may not have included a diagram of the accident, could properly lead to the inference drawn by the trial court: that Ms. Rogers knew that this was a dangerous curve. Moreover, all of the evidence presented at trial as to the location of the school bus preponderates against any inference that the bus crossed the center line prior to the collision. Furthermore, the missing witness/evidence rule relates to a trial court's instructions to the jury regarding allowable inferences. *Id.* at *6; *Richardson v. Miller*, 44 S.W.3d 1, 26 (Tenn. Ct. App. 2000). We fail to see how the rule would apply in the context of a bench trial. *See Estate of Hamilton*, 2011 WL 532296, at *6.

We must conclude that the trial court erred in applying the missing witness/evidence rule in this matter and that, even if the rule applied, the evidence preponderates against the inferences made by the trial court.

III. *Breach of duty and proximate cause*

The elements of a negligence claim are a duty of care, breach of the duty of care, injury or loss, cause in fact, and proximate or legal cause. *Rathnow v. Knox Cnty.*, 209 S.W.3d 629, 633 (Tenn. Ct. App. 2006). In this case, the disputed issues are breach of duty and proximate cause, both questions of fact. *Rains v. Bend of the River*, 124 S.W.3d 580, 588 (Tenn. Ct. App. 2003). Metro asserts that the plaintiffs failed to meet their burden of proof regarding breach of duty and proximate cause.

We must examine the record to determine whether the evidence preponderates against the trial court's findings regarding breach of duty and proximate or legal cause. Proof by a preponderance of the evidence requires proof that the alleged fact "is more likely true than not true." *McEwen v. Tenn. Dep't of Safety*, 173 S.W.3d 815, 825 n.19 (Tenn. Ct. App. 2005); *see also Teter v. Republic Parking Sys., Inc.*, 181 S.W.3d 330, 341 (Tenn. 2005). A

fact may be proven by direct and/or circumstantial evidence. *McEwen*, 173 S.W.3d at 825. Circumstantial evidence is "'evidence of a fact or set of facts from which the evidence of another fact may be reasonably inferred.'" *Parish & Parish Mining Co. v. Serodino, Inc.*, 372 S.W.2d 433, 450 (Tenn. Ct. App. 1963) (quoting PROSSER ON TORTS 291 (1941)).

While the trial court did not include factual findings in its order of judgment, the court did make some relevant factual rulings from the bench:

> The Court finds that [Ms. Rogers] was speeding, going too fast for the conditions on the road of New Hope. Going 30 to 35 miles an hour in an area that's a dangerous curve, where the suggested speed is at least 20 miles per hour on one sign. I think that's what the officer says, "suggestive speed," Officer Upchurch, who's in the courtroom. And that that speed was a contributing factor to the kinetics of the accident and could very well have been circumstantial and added to the head injury that affected Marisa, who landed, by the way, six rows back from the front seat where she was seated seated with her brother.
>
> In fact, in the record, although it wasn't developed, she was actually standing, apparently, according to some children on the bus. And the only person standing, apparently.
>
> But be that as it may, I must look at Ms. Rogers's credibility, what she was doing, the many ways she did violate the policies and procedures. One, going on a route that was not approved. That, in and of itself, the Court would not find against Metro Government, but when you consider that in light of the fact that she had a Coke bottle in her lap, she said it was plastic, Mr. Donn said it was a can, who knows? The fact that she said that she had a boombox that was tied down, Ms. Sales's credibility I put above Ms. Rogers's, disputes that. I think it was not tied down.
>
> In fact, the words of Ms. Rogers herself somewhere in the record says that, "At the moment of collision, everything went flying." I have yet to hear her identify what was flying other than perhaps glass. The fact that the accident report that she made to the Transportation Department does not show the original backside, the Court has backed off the spoliation finding. I do not back off the missing witness rule, that the backside of the original document was very appropriate to the Court and is missing. And there is an inference that she knew it was a dangerous intersection—dangerous curve. Excuse me.

-17-

In fact, it could have been with the length of the bus and the fact that the bus was almost 10 feet in width and the lane was only 10 feet in width, physically from a physics' standpoint, that is, it could show that the bus was over the line, at least part of the bus. Even though Mr. Stanley went over the yellow line and hit this bus head-on, it could show that that bus could not negotiate that curve with that part of it being over the side. I'd loved to see that diagram, which I don't have.

So it gets to credibility. Ms. Rogers denied most everything that Ms. Sales found to be true, and the Court comes down on the part of Ms. Sales. So, she hit a tree, then hit another tree, and came to a stop. How this child was hurt, could have been a missile, could she have gone, as Mr. Upchurch surmises, and hit the front door turning the apparatus? Maybe. But the Court believes circumstantially that this young lady was probably hit by a flying object of some kind and it could have been anything.

But the speed of the car, speed of the bus, was a contributing factor to this case, and therefore, the Court finds that Metro Government violated some standard of policy and procedures. The Court finds that it was a high duty, not only as a driver of a school bus, but also similar to that of a common carrier, and the procedure has to be followed. It was not in this case. It was not followed on the route for three weeks. Never was changed even afterwards, which the Court takes into evidence.

The Court takes into evidence that the bus from mirror to mirror was 10 feet, approximately 10 feet, and the lane was 10.1 feet, with overhanging trees, it is a very rural and dangerous road. The Court finds, in fact, that the curve was dangerous. With all of that put together, the Court believes and is of the opinion that Metro contributed to this accident 25 percent.

In its analysis, the trial court focused on three main factual issues: the speed of the bus, the bus driver's lack of compliance with school policies, and the route taken by the bus driver.[4] We will discuss each of these topics separately.

A.  Speed of the school bus

_____

[4]In our analysis above regarding the missing witness rule, we rejected the trial court's inferences regarding the bus crossing the center line and Ms. Rogers's alleged knowledge that North New Hope was a dangerous road.

The trial court reached the conclusion that the school bus was traveling at an excessive speed under the circumstances (road conditions and the dangerousness of the road) and that the bus's speed was a contributing factor to the injuries suffered by Marisa. What is the evidence pertinent to the appropriateness of the bus's speed and the effect of that speed on the plaintiffs' injuries, including those sustained after the initial impact between the bus and the pickup truck?

There is no real dispute that Ms. Rogers was driving the school bus at about 30 miles per hour at the time of the accident and that the posted speed limit was 35 miles per hour. Sergeant Upchurch, the police department's accident investigator/specialist in accident reconstruction, opined that the accident was caused by Mr. Stanley's excessive speed and the lack of tread on his tires. He found no evidence to suggest that the school bus entered the truck's lane. Based upon his investigation, Sergeant Upchurch concluded that the school bus was not speeding before the collision and that "there was no contributing factors caused by the bus itself." Mr. Stanley testified that the school bus did not enter the northbound lane of traffic and did not appear to be speeding at the time of the accident.

Mr. Hutchison, Metro's accident reconstruction expert, testified that the school bus was traveling at an appropriate speed in light of the road conditions and the characteristics of the road itself. He found no fault with the actions of the bus driver. There was no evidence that the bus entered the other lane; in fact, the evidence suggested that the driver was moving over toward the shoulder in an attempt to avoid the collision. Mr. Hutchison opined that a bus traveling at 30 to 35 miles per hour heading into the curve in question on wet pavement could safely navigate the curve. He testified that there was no evidence that the school bus hit the trunk of the tree near which it came to rest. Mr. Donn, the plaintiffs' expert, did not give any testimony that Ms. Rogers was traveling at an excessive speed or that the speed of the school bus was a contributing factor.

The trial court made a specific finding that speed "was a contributing factor to the kinetics of the accident and could very well have been circumstantial and added to the head injury that affected Marisa . . . ." We find no evidence in the record to support this theory.

We find that the evidence preponderates against the trial court's conclusions regarding the speed of the school bus. While there may have been a sign giving a suggested speed of 20 miles per hour near the curve in question, there is no evidence to support the trial court's conclusion that the speed of the school bus was excessive in light of the road and the weather conditions or that the bus's speed contributed to the accident or the injuries it caused. In fact, all of the evidence supports the opposite conclusion—that the bus's speed was appropriate

and did not contribute to the collision or the severity of the injuries.[5]

### B.  Driver's lack of compliance with school policies regarding radio and drink

It is important to note here that violation of a school system's internal policies and procedures does not constitute negligence per se. *Haney v. Bradley Cnty. Bd. of Educ.*, 160 S.W.3d 886, 892 (Tenn. Ct. App. 2004); *Sharp v. Anderson Cnty.*, No. 03A01-9508-CV-00282, 1996 WL 42237, at *3-4 (Tenn. Ct. App. Feb. 5, 1996).  Rather, the defendants' actions must be judged according to the standard of care discussed above—reasonable and ordinary care under the circumstances.  *Sharp*, 1996 WL 42237, at *3.

The trial court made several findings with respect to the bus driver's actions in having a soda bottle between her legs and a boom box at the front of the bus in violation of school policy.[6]  The court found the credibility of Ms. Sales to be greater than that of Ms. Rogers and reached the conclusion that the boom box was not tied down.  The court then concluded "circumstantially that this young lady [Marisa] was probably hit by a flying object of some kind and it could have been anything."

What is the evidence with respect to the soft drink bottle and the boom box?  Mr. Donn, the plaintiffs' expert, testified that the presence of the soda bottle and the boom box caused him to question what happened and whether Ms. Rogers was able to brake with a soda bottle between her legs.  These facts raised "a red flag that we needed to look into the details."  Mr. Donn testified that he did not know whether the soda bottle affected Ms. Rogers's ability to brake or whether the boom box was tethered, but these factors made him think that the school bus driver had the attitude "that I'm going to operate the way I want to operate and maybe I'll follow the rules and maybe I won't."

Ms. Rogers testified that she did have a soda bottle between her legs at the time of the accident but that the bottle did not distract her, keep her from braking, or keep her from having control of the bus.  Ms. Rogers also testified that the boom box was tethered on the engine compartment or "doghouse" and did not distract her in any way.  After the accident, the soda bottle was on the floor board and the boom box radio "was still sitting where it was bound" on the doghouse.

---

[5]The preponderance of the evidence also fails to support the plaintiffs' theory that Ms. Rogers's failure to exercise reasonable care (allegedly reflected in the speed of the bus and her failure to exert adequate control) caused the bus to hit a tree, thereby worsening Marisa's injuries.

[6]The bus driver's failure to follow the prescribed route, another policy violation, will be discussed separately below.

During later questioning with respect to photographs taken after the accident, Ms. Rogers identified the boom box sitting on top of the doghouse and attached there with bungee cords. She reiterated that the boom box did not leave the doghouse during the accident and that she recalled seeing it there after the accident.

Ms. Sales, the school safety investigator, testified that she arrived at the accident scene about 15 or 20 minutes after the accident, after all of the injured persons had been taken to the hospital. She had concerns about whether the boom box may have "gone airborne" during the accident:

> Q. Okay. And I think you said in your deposition, I asked you—we talked about the yellow radio there on the doghouse, and I said was that radio—"Where was the radio when you got there?" And you answered, "Well, it wasn't in that position. They went airborne. They weren't tied down, so they went airborne." . . . Do you recall telling me that in your deposition?
> A. It wasn't tied down.
> Q. Okay. There was some photographs that appeared to see [sic] it's on the doghouse and there's some tethers to it or something. But you're saying it wasn't tied down, it wasn't secured?
> A. No. It wasn't secured.
> . . .
> Q. Okay. And I believe you testified in your deposition that it was your opinion that Marisa had struck her head on something metal on the front of the bus, correct?
> A. Yes. That's my opinion.
> Q. And you indicated there was some blood on some screws by the handle that opens the door, and that's what you thought probably cause[d] the head injury, correct?
> A. Yes. That was my opinion at the time.

Sergeant Upchurch, a trained accident reconstructionist, reached the conclusion that Marisa was thrown toward the front of the bus and hit the door handle. He opined that there was no evidence that the radio/boom box hit Marisa. Sergeant Upchurch further stated that, from his investigation, the presence of the radio had no effect on the collision. Mr. Hutchison, the expert accident reconstructionist testifying for Metro, opined that neither the boom box nor the soda distracted the bus driver or slowed her reaction to the collision.

Taking into account all of the evidence, we find that the evidence preponderates against the conclusion that Ms. Rogers's possession of the plastic soda bottle or boom box had any effect on the collision or Marisa's injuries. The trial court expressly credited the

testimony of Ms. Sales over that of Ms. Rogers concerning whether the boom box "went airborne" when the vehicles collided. The testimony of Ms. Sales, who acknowledged that she was not an accident reconstructionist and that her job was not to determine the cause of the accident, is contradicted by the testimony of Sergeant Upchurch and Mr. Hutchison, Metro's expert, both of whom were trained to reconstruct accidents. Moreover, the post-accident photos indicate that the boom box remained tethered. Mr. Donn, the plaintiffs' expert, testified that the soda bottle and the boom box raised questions, but he could not state that they actually had any effect. Even accepting Ms. Sales's testimony that the boom box was not secured after the accident, there is no evidence that the boom box hit Marisa. Ms. Sales, Sergeant Upchurch, and Mr. Hutchison all testified that Marisa hit the handle to the bus door. Thus, there is nothing to support the trial court's conclusion that Marisa was probably injured by a flying object.

### C.  Route taken by school bus driver

Ms. Rogers violated school board policy by deviating from her assigned route without permission. (As discussed above, such a violation of school policy does not constitute negligence per se.) Was Ms. Rogers's decision to take North New Hope Road a breach of her duty of care and the proximate cause of the accident?

Mr. Donn, the plaintiffs' expert, opined that he would not have used North New Hope Road unless there were children who lived on that road (not the situation here). According to Mr. Donn, a school bus measures almost ten feet from mirror to mirror while, according to the accident reconstructionist (Mr. Upchurch), the lane on North New Hope Road measured 10.1 feet.

Mr. Felts and Mr. Luffman, residents on North New Hope Road, testified about previous accidents at the curve where the accident happened. On cross-examination, Mr. Luffman was asked about one of the roads on the school bus's assigned route, Earhart Road. The witness described it as "very crooked, narrow and hilly." When asked whether Earhart was as hilly or hillier than North New Hope, Ms. Luffman stated: "It's just like our roads. They're all back country roads." The plaintiffs introduced into evidence a list of previous accidents on North New Hope Road.

Ms. Rogers, the school bus driver, testified that Earhart Road and Tulip Grove Road, part of her assigned route, were worse roads in her opinion than North New Hope Road. She stated that she opted to take North New Hope Road to avoid the congestion and traffic that day on her assigned route. Ms. Rogers further testified that she did not think that North New Hope Road was more dangerous than other roads she had to drive on. Ms. Sales, the school safety investigator, testified that, while school policy required a bus driver to receive prior

approval before deviating from her assigned route, bus drivers were also instructed to use their good judgment since they were the ones actually on the road. Ms. Sales expressed safety concerns about Ms. Rogers being off of her assigned route on North New Hope Road at the time of the accident.

Mr. Hutchison opined that North New Hope Road, as it existed at the time of the accident, could safely accommodate a school bus. He did not think that the curve in question made the road inappropriate for a school bus. Mr. Hutchison also testified as follows:

Q. In your time as an accident reconstructionist in Davidson County, have you had an opportunity to look at various roads in Davidson County?
A. I have. Many roads.
Q. Now, considering the hill or hills on North New Hope Road where this collision occurred, is this hill considerably steeper or different than many other hills in Davidson County?
A. It's not.
Q. And considering the curve on North New Hope Road where the accident took place, is that curve sharper or different from the many other curves in Davidson County?
A. No.

Ms. DeMoss, Metro's school bus routing supervisor, testified that Metro designated certain roads as "no travel," which meant they were unsafe for school buses. North New Hope Road was not flagged as "no travel." When asked about calls received by drivers needed to modify their route on a particular day, Ms. DeMoss stated: "Having worked in dispatch, I don't know of any time that we've ever told a driver, 'Oh, no, you can't change your route.'" She opined that there would have been no reason for a dispatcher to deny permission to a driver to use North New Hope Road. Ms. DeMoss testified that, to her knowledge, no bus driver had recommended removing North New Hope Road from the bus routes. She stated that Metro often had to send buses over roads with curves and hills, that there were many such roads in Davidson County used by school buses, and that North New Hope was not significantly different from other such roads used by Metro school buses.

The evidence preponderates against the trial court's factual findings that North New Hope Road was dangerous and that Ms. Rogers knew it was dangerous. Overall, we find that the evidence preponderates against the trial court's finding that Ms. Rogers/Metro failed to act reasonably under the circumstances in taking the alternate route she chose. Moreover, the evidence preponderates against the trial court's conclusion that Ms. Rogers's decision to use North New Hope Road was the proximate or legal cause of the plaintiffs' injuries. There is a three-prong test applicable to proximate cause:

(1) the tortfeasor's conduct must have been a "substantial factor" in bringing about the harm being complained of; and (2) there is no rule or policy that should relieve the wrongdoer from liability because of the manner in which the negligence has resulted in the harm; and (3) the harm giving rise to the action could have reasonably been foreseen or anticipated by a person or ordinary intelligence and prudence.

*Haynes v. Hamilton Cnty.*, 883 S.W.2d 606, 612 (Tenn. 1994) (quoting *McClenahan v. Cooley*, 806 S.W.2d 767, 775 (Tenn. 1991)). While there is no doubt that this particular accident would not have occurred had Ms. Rogers not been driving on North New Hope Road, we disagree that her actions were a substantial factor in causing the accident. *See Spurlock v. Jackson Cnty.*, No M1999-01407-COA-R3-CV, 2000 WL 1231381, at *7 (Tenn. Ct. App. Aug. 31, 2000). It was the actions of Mr. Stanley, which were not reasonably foreseeable, that resulted in this accident.[7]

CONCLUSION

The judgment of the trial court is reversed. Costs of appeal are assessed against the plaintiffs, and execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE

---

[7]Because of these conclusions, we need not consider the other issue raised by Metro on appeal (concerning the trial court's consideration, sua sponte, of certain evidence).

-24-